**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ARCH INSURANCE COMPANY (EUROPE) LTD., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS K. REILLY,<br><br>Defendant. | Civil Action No. 20-cv-2080 (JXN)(SDA)<br><br><br>**OPINION** |

**NEALS**, District Judge

Defendant Thomas K. Reilly ("Defendant") sued his former employer, Chemoil Energy Ltd. ("Chemoil"). Chemoil filed a counterclaim. Defendant requested coverage for his legal fees under Chemoil's Directors and Officers insurance policy ("Policy"). Plaintiffs,[1] the insurers, agreed to pay Defendant's costs in defending against the counterclaim and advanced him $880,000 ("Interim Payment"). After Defendant won in arbitration, he sought $2.1 million in attorneys' fees and costs from Chemoil, including the cost of defending against the counterclaim. Unbeknownst to Plaintiffs, Chemoil and Defendant settled the fee claim for $1.2 million ("Chemoil Settlement"). Because the Chemoil Settlement left Plaintiffs unable to recover the Interim Payment from Chemoil, they sued Defendant instead, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and quantum meruit. Defendant raised counterclaims for breach of contract and breach of the implied covenant.

---

[1] "Plaintiffs" collectively refer to Arch Insurance Company (Europe) Ltd. n/k/a Arch Insurance (UK) Ltd. ("Arch"), Liberty Mutual Insurance Europe SE ("Liberty Mutual"), Hiscox Dedicated Corporate Member Limited ("Hiscox"), Barbican Corporate Member Limited ("Barbican"), Endurance Corporate Capital Ltd ("Endurance"), and Dual Corporate Risks Ltd ("Dual" or "DUAL").

Before the Court are competing summary judgment motions filed by Plaintiffs (ECF No. 76) and Defendant (ECF No 78). Each party opposed the other's motion (ECF Nos. 79, 80) and replied in further support of their own (ECF Nos. 81, 82). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure[2] 78 and Local Civil Rule 78.1. For the reasons set forth below, the cross-motions for summary judgment are **GRANTED** in part.

## I.      BACKGROUND

### A.      Statement of Facts[3]

#### i.      *The Policy*

This case is about a Directors and Officers insurance policy issued to Chemoil. (*See* DSMF ¶ 2.) Broadly, the Policy insured Chemoil's directors and officers for costs incurred in responding to investigations, kidnappings, reputational crises, regulatory violations, and relevant here, lawsuits against the director or officer. (*See* Pls.' Ex. A ("Policy") § 3.7, ECF No. 76-3.)

The Policy listed Dual, a London-based insurance company, as "Insurer." (*Id.* at *13.[4]) The Policy provided that

> The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

---

[2] "Rule" or "Rules" hereinafter refers to the Federal Rules of Civil Procedure.

[3] The Court derives the undisputed facts from the parties' statements of material facts, affidavits, and exhibits. (*See, e.g.*, Pls.' Statement of Undisputed Material Facts ("PSMF"), ECF No. 67-1; Def.'s Statement of Undisputed Material Facts ("DSMF"), ECF No. 71-1.) The Court disregards portions of "the parties' statements of material facts that either lack citation to relevant record evidence and/or contain legal argument or conclusions." *Jones v. Sanko Steamship Co., Ltd*, 148 F. Supp. 3d 374, 380 n.9 (D.N.J. 2015) (citing L. Civ. R. 56.1(a)). Likewise, the Court considers facts undisputed where the opposing party's response relies on "improper arguments, conclusions, and purported disputes of fact without proper citation to the record." *Smith v. Township of Clinton*, No. 17-935, 2018 WL 4188457, at *1 (D.N.J. Aug. 31, 2018), *aff'd,* 791 Fed. Appx. 363 (3d Cir. 2019).

[4] Pincites preceded by an asterisk (*) reflect CM/ECF page numbers.

. . . .

. . . [T]he proportion of liability under this contract underwritten by each (re)insurer (or in the case of a Lloyd's syndicate, the total of proportions underwritten by all members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line."

(*Id.* at *5.)

The Policy's stamp ("Stamp") appears as follows:



(*Id.* at *7.) Arch, Liberty Mutual, Hiscox, Barbican, and Endurance (collectively, "Underwriters") are the corporate successors to those four insurance companies.[5] (PSMF ¶ 10.)

Though the Policy identifies Dual as "Insurer," it did not underwrite any portion of the Policy's liability. (Policy at *13.) Instead, Dual handled the Policy's claims on behalf of the Underwriters.[6] (PSMF ¶¶ 14–15; Pls.' Ex. H ("Candy Aff.") ¶ 10, ECF No. 76-10; Policy at *13 ("Notification of Claims . . . shall be given to . . . DUAL . . . ."); *id.* at *56 (listing Dual as "Slip

---

[5] Defendant disputes this fact because the five Underwriters are not the same as the four entities who underwrote the Policy. (Def.'s Counterstatement of Material Undisputed Facts ("CSMF") ¶ 10, ECF No. 72-1.) This is true—the five Underwriters are the *corporate successors* to the four original underwriters. But an insurance policy need not (and indeed, cannot) predict the future of its underwriters.

[6] Defendant disputes this fact, arguing that (a) the Policy's Endorsement page referred to Dual as the "slip leader" (or lead insurer) for the Policy, and (b) the term "Managing General Agent" did not appear anywhere in the Policy. (CSMF ¶¶ 13–14.) But "mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." *Harford Mut. Ins. Co. v. Z&D Realty, LLC*, 648 F. Supp. 3d 499, 509 (D.N.J. 2022). Defendant neither explains why Dual's role as "slip leader" meant it did not handle claims for the Underwriters, nor why the lack of the term "Managing General Agent" meant Dual had some other role within the Policy. Instead, Defendant bridges the gap with conjecture, which the Court disregards.

Leader" and requiring all claims to be agreed "by the Slip Leader" and underwriters)). According to Plaintiffs, this setup is common in the British insurance market: one insurer, often called a "Managing General Agent," handles all the claims, while other insurers accept all the risk. (PSMF ¶ 14; *see also* Candy Aff.) Dual and Arch's claims administrators identified Dual as the Managing General Agent for the Policy. (Candy Aff. ¶ 9; Pls.' Ex. I ("Hanson Aff.") ¶ 7.)

The Policy has four provisions relevant to this action:

### a.    The Consent Clause

First, the Policy has a Consent Clause, providing:

> The Insureds shall not admit or assume any liability, offer to settle, enter into any settlement agreement, consent to any judgment, or incur any Claim Costs without the prior written consent of the Insurer, (such consent not to be unreasonably withheld or delayed).

(Policy § 4.4.)

A "Claim" means "a written demand for monetary, non-monetary or injunctive relief from a Third Party alleging a Wrongful Act," or "a civil, criminal, administrative, regulatory or arbitration/mediation proceeding (including any counterclaim)." (*Id.* §§ 3.7.1–3.7.2.) "Claim Costs" include "Defence Costs," which are:

> reasonable and necessary fees, costs, charges and expenses incurred with the prior written consent of the Insurer (such consent not to be unreasonably withheld or delayed): (1) by or on behalf of an Insured in the investigation, defence, adjustment, settlement or appeal of any Claim made or brought against the Insured; (2) by any accredited expert retained through defence lawyers, approved in writing by the Insurer, on behalf of the Insured to prepare an evaluation, report, assessment, diagnosis or rebuttal of evidence in connection with the defence of a Claim . . . .

(*Id.* §§ 3.8, 3.14.)

### b.    The Subrogation Clause

Second, the Policy had a Subrogation Clause, stating:

4

> Upon any payment on any Claim the Insurer shall be entitled to assume all rights of recovery available to any Insureds or the Company, including but not limited to trying to recover from the Company any Financial Loss or Retention paid by the Insurer pursuant to Section 10.3 of this Policy. The Insureds and the Company shall provide all reasonable assistance to the Insurer in the prosecution of such rights and shall not prejudice such rights. . . .

(*Id.* § 10.4.) Within the meaning of the Policy, "Financial Loss" includes Defence Costs. (*Id.* § 3.30.2.)

### c.    The Allocation Clause

Third, the Policy has an Allocation Clause, dictating:

> The Insurer will be liable only for Financial Loss derived exclusively from a covered Claim. If a Claim involves both covered and uncovered matters or persons under this Policy, the Company, the Insured and the Insurer shall use reasonable efforts to determine a fair and equitable allocation of Financial Loss covered under this Policy taking into account the legal and financial exposures, and the relative benefits obtained by the relevant party(ies). If the Insurer, the Company and the Insured cannot agree on allocation in accordance with this Section 4.6, then all such parties hereby agree to refer to the determine of the Alternative Dispute Resolution proceeding/procedure stated in this Policy. To the extent that any person or entity was paid Financial Loss under this Policy to which they were not entitled, any such payments shall be repaid, on written demand, to the Insurer by the person or entity to whom or on whose behalf such payments have been made.

(*Id.* § 4.6.)

### d.    Choice of Law

The Policy also contained a choice of law provision, stating:

> This insurance shall be governed by and construed in accordance with the laws of England & Wales and each party agrees to submit to the exclusive jurisdiction of the courts of England & Wales.

(*Id.* at *2.)

### ii.    *The Arbitration*

Defendant served as Chemoil's CEO from 2011, until he resigned in June 2014. (PSMF ¶ 2; Def.'s Ex. 3 ("Resignation Letter"), ECF No. 78-8.) Three months later, Defendant initiated

arbitration against Chemoil for severance benefits allegedly owed to him. (PSMF ¶ 3.) Chemoil filed a counterclaim. (*Id.* ¶ 4.)

In March 2017, Defendant notified Dual of Chemoil's counterclaim and demanded coverage as an insured under the Policy. (*Id.* ¶ 5; DSMF ¶ 25.) Several days later, Dual replied to Defendant via email. Dual stated that, as Chemoil's insurer, it had "no contractual or other legal relationship" with Defendant. (Def.'s Ex. 5, ECF No. 78-9.) Dual stated that "[i]f or when [the action] is notified by [Chemoil], we will investigate it in the usual way, but only as between ourselves and [Chemoil]." (*Id.*) Dual went on to write: "[i]n the meantime, we do not accept your letter as notification of a Claim . . . on behalf of [Chemoil]. Further, we have not considered whether (potentially) the [P]olicy provides cover for the matters referred to in your letter." (*Id.*)

Defendant requested coverage from Dual again. (Def.'s Ex. 6, ECF No. 78-10.) This time, Dual asked Defendant for more information about the arbitration and the events leading up to it. (Def.'s Ex. 7, ECF No. 78-11.) Dual also clarified it had "not confirmed coverage and therefore any actions by [Defendant] or costs that he incurs . . . will be as a prudent uninsured. (*Id.*) Defendant provided the additional information (*see* Def.'s Ex. 11, ECF No. 78-15), but Dual replied that his claim "would appear not to be covered" based on the Policy's definitions of "Claim" and "Third Party." (*See* Def.'s Ex. 12 at *3, ECF No. 78-16.) Dual then gave Defendant the option to provide his "full reasoning" as to why the claim was covered if he disagreed with Dual. (*Id.*)

After another back-and-forth between the parties (DSMF ¶¶ 14–15), in September 2017, Dual determined that Chemoil's counterclaim amounted to a "Claim" against an "Insured Person" within the meaning of the Policy. (*See* Def.'s Ex. 16 ("Coverage Determination") § 2.5, ECF No.

6

78-20.) However, Dual concluded that the Policy "will only respond to [Defendant's] Defence Costs in dealing with the Counterclaims." (*Id.* § 2.7.)

Defendant claimed he already incurred over $950,000 in defense costs. (*Id.* § 2.13.) Dual found that already-incurred defense costs fell within the "Emergency Costs" extension under the Policy. (*Id.* § 2.14.) Dual then explained that defense costs must be "reasonably incurred" and noted that Defendant's "costs are very substantial for such a short period of time (i.e. less than a year)." (*Id.* § 2.15.) Dual also remarked that, where a "Claim involves both covered and uncovered matters," the Policy requires the parties to "use their reasonable efforts to determine a fair and equitable allocation." (*Id.* § 2.17.) For Dual to "move forward" and reimburse Defendant's existing costs "incurred to date in defending the Counterclaims," Dual requested more information from Defendant about his invoices and the scope of work performed. (*Id.* § 3.1) Dual also asked Defendant to "confirm what costs you estimate will be incurred in dealing with the counterclaims going forward." (*Id.* § 3.2.)

Defendant replied with more information about his costs, which he claimed totaled $1,480,209.67. (Def.'s Ex. 17 at *9, ECF No. 78-21.) He requested that Dual cover 95% of those expenses. (*Id.*) Dual disputed that "95% of the costs claimed is likely to be a fair and reasonable allocation of costs between the claim costs and the counterclaim costs," but agreed to review the matter further. (Def.'s Ex. 18, ECF No. 78-22.) Shortly thereafter, Dual offered to "make an interim payment of 60% of the figure claimed" and acknowledged "that a more thorough review will be required to confirm the allocation percentage correctly." (Def.'s Ex. 20, ECF No. 78-24.) The Underwriters agreed to tender the $880,000 "as an interim payment subject to the terms of the [P]olicy" ("Interim Payment") (Pls.' Ex. Q, ECF No. 76-19), and paid a portion of the $880,000

equal to the percentage of liability they accepted under the Policy.[7] (Pls.' Ex. S at *2, ECF No. 76-21.)

In January 2018, Defendant prevailed before the arbitration panel ("Panel"), who awarded Defendant roughly $3 million and denied Chemoil's counterclaims. (*See* Pls.' Ex. T ("Arb. Award") at 51–52, ECF No. 76-22.) The Panel invited Defendant to seek an award of attorneys' fees from Chemoil. (*Id.* at 50–51.)

Defendant applied ("Fee Application") to the Panel to recover around $2.1 million in costs and fees. (*See* Pls.' Ex. U ("Fee Appl."), ECF No. 76-23.) Defendant incurred around $1.7 million in fees after Chemoil filed its counterclaim. (*See id.* at 8–10.) The Fee Application, however, did not explicitly mention that Defendant already received an $880,000 Interim Payment from the Underwriters; instead, it advised that Defendant had "pursued coverage" under the Policy, though he had not reached an agreement with the carrier "on the full amount of reimbursement." (Fee Appl. at 4 n.2.) Defendant also represented he was "not seeking, nor will he obtain, a double recovery." (*Id.*)

Prior to submitting the Fee Application, Defendant submitted a draft to Dual's counsel. (*See* Pls.' Ex. Y, ECF No. 76-27.) Defendant also submitted a proposed "term sheet" to Plaintiffs. (*See* Pls.' Ex. Z ("Term Sheet"), ECF No. 76-28.) The term sheet "set[] forth the principal terms to resolve" Dual's[8] obligations to Defendant under the Policy. (*Id.* at *3.) One of the proposed terms provided that, if the Panel "delineate[d] its fee award between [fees and costs] incurred for [Defendant's] claims and for the counterclaim, [Defendant] will reimburse [Dual] the amount

---

[7] Defendant denies this fact by repeating its argument that the Policy defines only Dual as the "Insurer." (CSMF ¶ 33.) Nevertheless, Defendant has not pointed to any *record evidence* showing that the Underwriters did not pay their proportional shares of the $880,000, or that Dual paid any portion of the share. Because Defendant offers only conclusory legal argument and no citation to the record, the Court considers this fact undisputed.

[8] The term sheet erroneously listed Lockton Insurance ("Lockton"), as the Policy's issuer. (*Id.* at *3.) Lockton was the Policy's broker, not the insurer. (*See* PSMF ¶ 45.)

delineated for the counterclaim within" thirty days of receiving the award. (*Id.* at *4–5.) It does not appear Dual ever agreed to the proposed term sheet.

### iii. Settlement

On February 16, 2018, Defendant notified Dual that he began negotiating a settlement with Chemoil for attorneys' fees. (*See* Pls.' Ex. AA, ECF No. 76-29; Pls.' Ex. DD at *3, ECF No. 76-32.) Later that day, Chemoil made a final offer of $1.2 million and the parties drafted a settlement agreement. (Pls.' Ex. AA at *3; Pls.' Ex. EE at *5, ECF No. 76-33.) Defendant provided Dual with the draft agreement and requested Dual's consent but he refused to disclose the amount of settlement. (Pls. Ex. EE at *4–5.)

The next day, Dual advised:

> This settlement, which directly impacts the insurer's rights, requires the consent of the insurers as required by the [P]olicy. We therefore need to understand why agreeing to this deal makes sense for [Defendant] and the insurers. We cannot even consider consenting without knowing the terms of the settlement, including most importantly the amount. Until we get the info we need, and have time to consider it, [Defendant] cannot enter into any agreement to resolve the defense fees and arbitration costs issues. Our position encompasses the fees and costs for both the affirmative claim and the counterclaim, as the settlement of one will necessarily impact the other.

(*Id.* at *3.) Defendant asserted he provided Dual with notice, the settlement benefitted Dual, and he would "not debate [the matter] further." (Pls.' Ex. DD at *2.) Nevertheless, over the next few days, the parties continued to discuss how any proposed settlement would be allocated between Defendant and Dual. (*See, e.g., id.*)

On February 21, 2018, Defendant's counsel issued an ultimatum to Dual:

> We have been discussing [Chemoil's] offer to settle [Defendant's] claim for fees and costs for nearly a week without any progress. . . . It is unreasonable and the height of bad faith for [Dual] to insist on reimbursement of any part of the 60% of fees paid to [Defendant]. Unless we receive a proposal by 11 am EST tomorrow, Feb. 22, that guarantees [Defendant] at least the same level of repayment of his fees and costs, he will have no alternative but to accept [Chemoil's] offer.

9

(Pls.' Ex. HH at *3–4, ECF No. 76-36.)

The next day, Dual stated it would consent to the $1.2 million settlement between Defendant and Chemoil ("Chemoil Settlement") if (1) Defendant agreed to reimburse $436,000 to Dual (70% of Counterclaim fees, rather than 60%); and (2) Plaintiffs would not be responsible for any of Defendant's other costs. (Pls.' Ex. II at *2, ECF No. 76-37.) Defendant never replied to Dual's proposal. (Pls.' Ex. JJ at *1, ECF No. 76-38.) Instead, several hours later, Defendant accepted Chemoil's $1.2 million settlement offer. (Pls.' Ex. AA at *2.) On March 5, 2018, Defendant finally informed Dual that he settled with Chemoil. (See Pls.' Ex. KK, ECF No. 76-39.)

## B.    Procedural History

Defendant sued Dual for breach of contract in December 2018 ("Reilly Action").[9] *See* Compl., *Reilly v. Dual Corp. Risks Ltd.*, No. 18-16836 (Dec. 4, 2018), Dkt. No. 1. Dual filed a counterclaim for breach of contract. *See* Answer, *Reilly*, No. 18-16836 (Jan. 11, 2019), Dkt. No. 9. In February 2020, the Underwriters filed this lawsuit to recover the $880,000 Interim Payment. (*See* Compl., ECF No. 1.) Thereafter, the Magistrate Judge stayed the Reilly Action while this case proceeded. *See* Stay Order, *Reilly*, No. 18-16836 (July 28, 2020), Dkt. No. 76.

The Underwriters amended their complaint twice[10] and added Dual as a plaintiff. (*See* Am. Compl., ECF No. 22; Second Am. Compl. ("SAC"), ECF No. 38.) The Second Amended Complaint includes claims for (1) declaratory judgment to declare that the Policy does not cover

---

[9] The Court notes that, despite a binding arbitration clause (Policy § 10.13), neither party moved to compel arbitration in either this or the *Reilly* action. Nor did the parties move to dismiss under the *forum non conveniens* doctrine, despite the fact that (a) none of the events giving rise to this case took place in New Jersey; (b) none of the parties have any presence in or connection to New Jersey, except for Dual, who has an office in Marlton; (c) the Policy, all of the Underwriters, and Dual are located in England; (d) the arbitration at issue took place in England; and (e) under the Policy, the parties agreed to bring all actions arising out of the Policy in England. (*Id.* at *2.)

[10] Plaintiffs filed their Second Amended Complaint after the Court dismissed the Amended Complaint for failure to sufficiently plead diversity jurisdiction. (*See* Op., ECF No. 36.)

the costs and fees Defendant incurred in pursuing his affirmative claims (Count I); (2) breach of contract as to the Policy's Consent Clause (Count II); (3) breach of contract as to the Policy's Subrogation Clause (Count III); (4) breach of the implied covenant of good faith and fair dealing (Count IV); (5) quantum meruit (Count V); and (6) quantum meruit/disgorgement (Count VI). (*See* Second Am. Compl. ¶¶ 94–172.)

Both parties moved for summary judgment. Plaintiffs argue that, as a matter of law: (1) the Policy is subject to English law; (2) the Policy does not cover Defendant's affirmative claim costs; (3) Defendant breached the Policy's Consent and Subrogation Clauses; (4) Defendant breached the implied covenant of good faith and fair dealing; (5) in the alternative, retaining the Interim Payment unjustly enriched Defendant; and (6) Defendant should disgorge the Interim Payment. (*See* Pls.' Moving Br., ECF No. 76-1.)

Defendant, meanwhile, argues (1) he is entitled to summary judgment on the breach of contract claims because Plaintiffs also breached the Policy; (2) the Consent Clause does not apply to the Chemoil settlement; (3) Plaintiffs waived their subrogation claim; (4) Plaintiffs did not suffer damages; (5) Plaintiffs' contract claim precludes their implied covenant and unjust enrichment claims, (6) no plaintiff is the "insurer"; and (7) the Court should grant summary judgment for Defendant on all of his counterclaims. (*See* Def.'s Moving Br., ECF No. 78-45.)

## II.    <u>LEGAL STANDARD</u>

Under Rule 56(a), the Court must grant a summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

11

The moving party has the burden of showing no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

The Court may not make credibility determinations or weigh evidence. *Anderson*, 477 U.S. at 255. "All facts and inferences are construed in the light most favorable to the non-moving party." *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The non-moving party, however, must offer more than a "mere scintilla" of evidence that a genuine dispute of material fact exists. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted). Furthermore, "a party does not raise a genuine [dispute] of material fact by speculation and conclusory allegations." *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 210 (D.N.J. 2001) (citation omitted).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citing *Weissman v. U.S. Postal Serv.*, 19 F. Supp. 2d 254, 259 (D.N.J. 1998)). The Court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir.1994). In other words, the Court is not required to grant one motion because it denies the other.

III.    **DISCUSSION**

A.    **Declaratory Judgment (Count I)**

Plaintiffs move for summary judgment on Count I of the Second Amended Complaint, which seeks a declaration that the Policy covers only expenses incurred in responding to Chemoil's counterclaims. (SAC ¶¶ 94–102.) Defendant did not brief the issue. (*See* Def.'s Opp'n Br.) Having reviewed the undisputed facts, Plaintiffs are entitled to judgment as a matter of law on Count I.

It is undisputed that Defendant was an Officer, and therefore, under the plain terms of the Policy, Defendant was an insured. (*See* Policy § 3.36.1.) And it is undisputed that the Policy covers defense costs for any claim "made or brought against the Insured," not for any claim made or brought *by* the Insured. (*Id.* § 3.14.) Accordingly, Plaintiffs are entitled to judgment as a matter of law that the Policy did not cover Defendant's costs incurred in litigating his affirmative claims against Chemoil. The Court, therefore, grants summary judgment for Plaintiffs on Count I.

B.    **Breach of Contract (Counts II and III)**

To state a claim for breach of contract, a plaintiff must show (1) "the parties entered into a contract containing certain terms"; (2) "plaintiffs did what the contract required them to do"; (3) "defendants did not do what the contract required them to do"; and (4) "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs." *Goldfarb v. Solimine*, 245 N.J. 326, 338 (2021) (quoting *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016)).

The Court interprets an insurance contract's language "according to its plain and ordinary meaning." *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010) (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 175 (1992)). "If the language is clear, that is the end of the inquiry." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008). "In the absence of any ambiguity, the meaning of a contract can be interpreted as a matter of law." *Arena v. RiverSource*

*Life Ins. Co.*, 356 F. Supp. 3d 413, 416 (D.N.J. 2018) (citing *J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989)), *aff'd,* 788 F. App'x 834 (3d Cir. 2019). A term is ambiguous if it is "susceptible to at least two reasonable alternative interpretations." *Chubb*, 195 N.J. at 238 (quoting *Nester v. O'Donnell*, 301 N.J. Super. 198, 210 (App. Div. 1997)). "An insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants. Rather, both interpretations must reflect a reasonable reading of the contractual language." *Powell v. Alemaz, Inc.*, 335 N.J. Super. 33, 44 (App. Div. 2000). Because insurance contracts are "contracts of adhesion," courts interpret genuinely ambiguous terms "to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning." *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 595 (2001). However, the Court will not torture the language of an insurance contract to manufacture an ambiguity where none exists or write a better policy than the parties agreed to. *Id.* at 596.

Plaintiffs argue (1) English law governs the Policy; (2) they are entitled to summary judgment on Count II of the Second Amended Complaint, that Defendant breached the Policy's consent clause; and (3) they are entitled to summary judgment on Count III of the Second Amended Complaint, that Defendant breached the Policy's subrogation clause.

### i.      *New Jersey Law Applies*

At the threshold, the Court notes the Policy contains a choice of law clause stating that the Policy shall be governed by English and Welsh law. (Policy § 10.2.) Plaintiffs argue the Court should enforce the Policy's choice of law provision as to the declaratory judgment and breach of contract claims. (Pls.' Moving Br. at 4.) Defendant argues the Court should disregard the choice of law provision because (1) Plaintiffs ignored other provisions of the Policy, including arbitration

14

and forum selection provisions; (2) English law is substantively the same as New Jersey law; and (3) the English cases Plaintiffs cite are inapposite. (Def.'s Opp'n Br. at 4–16.)

In diversity cases like this one, the Court looks to "the choice-of-law rules of the forum state—the state in which the District Court sits—in order to decide which body of substantive law to apply to a contract provision, even where the contract contains a choice-of-law clause." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). Therefore, the Court applies New Jersey's choice-of-law rules to this case.

"Procedurally, the first step is to determine whether an actual conflict exists." *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008). "If not, there is no choice-of-law issue to be resolved." *Id.* An actual conflict arises "when the application of one or another state's law may alter the outcome of the case, or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." *In re Accutane Litig.*, 235 N.J. 229, 254 (2018) (citations omitted). However, "foreign law is treated as a fact that must be proven by the parties." *Abdille v. Ashcroft*, 242 F.3d 477, 490 n.10 (3d Cir. 2001). The party "who seeks the benefit of foreign law . . . thus carries the burden of demonstrating its content." *Id.* at 490. Because Plaintiffs seek the benefit of English law, they must prove it materially conflicts with New Jersey law.

Plaintiffs do not point to any meaningful difference between New Jersey and English law as it relates to this case. (*See* Pls.' Moving Br.; Pls.' Reply Br., ECF No. 81.) To the contrary, Plaintiffs concede

> there are some similarities between English and New Jersey laws, including that clear and unambiguous contract terms are enforced as written, an insured settling without its insurer's consent constitutes breach of a policy's consent condition, and insurance contracts are formed out of the utmost good faith as between both insureds and insurers.

(Pls.' Reply Br. at 3 n.5.) While Plaintiffs go on to claim that English and New Jersey law "are not the same in all material respects," they do not identify any differences between the two bodies of law. (*Id.*) Having surveyed the English cases Plaintiffs cite, it appears English and New Jersey law do not actually conflict for purposes of this motion. *See Amlin Corp. Member Ltd. v. Oriental Assurance Corp.*, [2014] 2 Lloyd's Rep 561, [44]–[45] (construing insurance clause based on "the language actually chosen by the parties," and "giving those words their ordinary natural meaning," unless "the background indicates that such meaning was not the intended meaning," or "the words selected by the parties are commercially nonsensical and it is clear that the parties intended some other purpose."); *Beazley Underwriting Ltd. v. Al Ahleia Ins. Co.*, [2013] EWHC 677 (Comm), [70], [86] (interpreting clause according to plain language and in view of contract as a whole); *Horwood v. Land of Leather Ltd.*, [2010] EWHC 546 (Comm), [25], [43]–[46] (determining intent of partes from words of contract). The Court, accordingly, applies New Jersey law to the Policy.

### ii.    *Plaintiffs are Insurers*

Defendant argues the Court should dismiss Plaintiffs' breach of contract claims because none of the Plaintiffs are the "Insurer" within the meaning of the Policy. (Def.'s Moving Br. at 33–35, ECF No. 78-45.) According to Defendant, the Policy is between the Insured and the Insurer. Yet, in Defendant's telling, Plaintiffs admit the Policy incorrectly labels Dual as the "Insurer" and does not define any Underwriter as an "Insurer." Therefore, Defendant argues he owed no duty to any of the Plaintiffs.

This argument lacks merit. The Policy plainly identifies Dual as an "Insurer" (Policy at *13), and the Underwriters as "(Re)insurers." (*Id.* at *5, 7). Moreover, it is undisputed that, according to the terms of the Policy, Dual handled all the Policy's claims while the Underwriters accepted all the Policy's liability. (PSMF ¶¶ 14–15; Policy at *13 ("Notification of Claims . . .

16

shall be given to . . . DUAL . . . ."); *id.* at *56 (listing Dual as "Slip Leader" and requiring all claims to be agreed "by the Slip Leader" and underwriters); Candy Aff. ¶ 10; Hanson Aff. ¶ 7.) Nor does Defendant's argument make the Policy ambiguous. An insurance policy is ambiguous only if the parties' conflicting interpretations each "reflect a *reasonable* reading of the contractual language." *Powell*, 335 N.J. Super. at 44 (emphasis added). Defendant's interpretation, by contrast, would have the Court cast aside the plain language of the Policy and read it as an insurance contract without insurers. The Court will not do so. The Court, therefore, concludes that Dual and the Underwriters are insurers within the meaning of the Policy.

### iii.   Breach of the Consent Clause (Count II)

The Policy provides that "Insureds shall not . . . offer to settle [or] enter into any settlement agreement . . . without the prior written consent of the Insurer (such consent not to be unreasonably withheld or delayed)." (Policy § 4.4.) The Consent Clause therefore has three conditions. First, it applies to insureds; second, it prohibits insureds from settling without the insurer's prior written consent; third, it prohibits the insurer from unreasonably delaying or withholding consent.

Plaintiffs argue summary judgment is warranted because it is undisputed that Defendant was an insured and he settled with Chemoil without Plaintiffs' consent. Those two facts are indeed undisputed: Defendant was an insured and he settled with Chemoil without Plaintiffs' consent. Defendant replies that he is entitled to summary judgment because Plaintiffs breached the Policy by unreasonably withholding their consent to the Chemoil Settlement.

Under New Jersey law, "where a policy has a consent to settle provision, an insurer has a duty to not unreasonably withhold consent to settle." *Mist Pharm., LLC v. Berkley Ins. Co.*, 479 N.J. Super. 126, 137 (App. Div. 2024) (citing *Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford*, 72 N.J. 63, 69–70 (1976)). A consent-to-settle provision thus obligates an insurer "to make an

17

honest, intelligent and good faith evaluation of the case for settlement purposes and to weigh the probabilities in a fair manner." *Fireman's Fund*, 72 N.J. at 69. Consequently,

> [i]f the insurer delays unreasonably in investigating and dealing with a claim asserted against its insured, the insured may make a good faith reasonable settlement and then recover the settlement amount from the insurer, despite the policy provision conditioning recovery against the insurer on its policy on . . . acquiescence by the insurer in the settlement.

*Id.* at 73.

Correspondingly, "[i]t is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance." *Magnet Res., Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 285 (App. Div. 1998). But "[w]hether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." *Id.* at 286.

On Plaintiffs' summary judgment motion, Defendant is entitled to every "reasonable inference" of fact. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340 (3d Cir. 2022) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). On Defendant's summary judgment motion, Plaintiffs are similarly entitled to every "reasonable inference" of fact. *Id.* "Summary judgment may not be granted, however, if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991).

Here, there is such a disagreement. The parties spent seven days negotiating the conditions under which Plaintiffs would consent to the Chemoil Settlement. (Pls.' Exs. AA, II.) Plaintiffs explained they would not consent to the Chemoil Settlement unless Defendant reimbursed Plaintiffs 60% of the proceeds. (Pls.' Ex. HH at *3–4.) Defendant refused and explained he would accept the Chemoil Settlement unless Plaintiffs provided an acceptable proposal. (*Id.*) The next

18

day, Defendant settled with Chemoil. Later, Plaintiffs offered to consent to the Chemoil Settlement if Defendant reimbursed 70% of the proceeds related to counterclaim costs. (Pls.' Ex. II at *2.)

A jury, making every reasonable inference for Plaintiffs, could conclude that Plaintiffs' terms (60% of the proceeds), the amount of time Plaintiffs spent negotiating (seven days), and Plaintiffs' final offer (70% of the counterclaim cost-related proceeds) were all reasonable and fell within Plaintiffs' duty to honestly evaluate and deal with Defendant's claim. If so, a jury could find Plaintiffs did not unreasonably withhold their consent to settlement, requiring a verdict for Plaintiffs as to Count II. On the other hand, a jury, making every reasonable inference for Defendant, could determine that the amount of the Chemoil Settlement ($1.2 million) was reasonable, Plaintiffs' demand for most of the Chemoil Settlement was unreasonable and unsupported by the Policy, and the seven days Plaintiffs took to negotiate terms put the Chemoil Settlement at risk, leaving Defendant no choice but to accept. If so, a jury could find that Plaintiffs materially breached the Consent Clause, requiring a verdict for Defendant as to Count II.

Only juries can make credibility determinations, weigh evidence, and draw inferences from the facts. *Anderson*, 477 U.S. at 255. Judges cannot. *Id.* Granting either party's summary judgment motion would require the Court to step into the jury box, weigh facts, and draw inferences. Because the Court cannot do so, the Court denies both parties' summary judgment motions as to Count II.[11]

---

[11] Defendant also argues that summary judgment is warranted because: (1) the Consent Clause does not apply to the Chemoil Settlement; and (2) insurers cannot recover damages where an insured settles without consent.

Starting with the applicability of the Consent Clause, Defendant stitches together several unrelated Policy provisions to assert the Policy does not cover claims brought by an insured against another insured. (*Id.* at 23.) Because this case involved claims brought by Chemoil and Defendant, Defendant argues the Consent Clause does not apply. (*Id.* at 22–24.)

But the plain language of the Consent Clause provides that an insured "shall not . . . enter into any settlement agreement . . . without the prior written consent of the Insurer." (Policy § 4.4.) "[A]ny settlement agreement" means just that, any settlement agreement. The Court declines the invitation to manufacture ambiguity where there is none. Moreover, the Policy has an exclusion provision for claims brought by the company (in this case, Chemoil) against an insured. (*Id.* § 9.5.) But that exclusion "shall not apply to . . . Defence Costs incurred by the Insured Person." (*Id.*) Therefore, the plain language of the Policy covered Defendant's counterclaim defense costs. (*Id.*)

### iv.       Breach of the Subrogation Clause (Count III)

The Policy's Subrogation Clause provides that:

Upon any payment on any Claim the Insurer shall be entitled to assume all rights of recovery available to any Insureds or the Company, including but not limited to trying to recover from the Company any Financial Loss or Retention paid by the Insurer pursuant to Section 10.3 of this Policy. The Insureds and the Company shall provide all reasonable assistance to the Insurer in the prosecution of such rights and shall not prejudice such rights. . . .

(Policy § 10.4.) Plaintiffs argue the Subrogation Clause, (1) gives Plaintiffs the rights to recover "any payment on any Claim"; (2) requires insureds to "provide all reasonable assistance to the Insurer" in recovering on a claim; and (3) prohibits insureds from prejudicing Plaintiffs' rights to recovery. (Pls.' Moving Br. at 21.) Plaintiffs argue that Defendant breached the Subrogation Clause when Defendant entered the Chemoil Settlement. The Chemoil Settlement released Chemoil from all claims, thereby preventing Plaintiffs from recovering their payments to Defendant, and prejudicing their rights to recovery. Defendant counters that Plaintiffs waived their right to subrogation.

Subrogation "allow[s] the insurer to seek recovery from the party at fault, exercised after the insurer has indemnified its insured under the terms of an insurance policy." *Palisades Ins. Co. v. Horizon Blue Cross Blue Shield of N.J.*, 469 N.J. Super. 30, 41 (App. Div. 2021) (quoting *City of Asbury Park v. Star Ins. Co.*, 242 N.J. 596, 604 (2020)). "The doctrine is based on the principle that a benefit has been conferred upon the insured at the expense of the insurer and vests in the

---

The damages argument similarly lacks merit. Defendant argues an insurer cannot recover damages from the breach of a consent provision, citing *Allied World Assurance Co. (US) Inc. v. Benecard Servs., Inc.*, No. 17-12252, 2020 WL 2840058, at *14 (D.N.J. May 31, 2020), and *Griggs v. Bertram*, 88 N.J. 347, 368–69 (1982). Neither case held that an insurer could not recover damages arising from the breach of a consent clause. *See Benecard*, 2020 WL 2840058, at *14 (concluding that insurance policy covered damages arising from *insured's* breach of contract); *Griggs*, 88 N.J. at 368 (holding that "a settlement may be enforced against an insurer in this situation only if it is reasonable in amount and entered into in good faith."). Instead, the Court can readily assess damages to "put the injured party in as good a position as if performance had been rendered." *Goldfarb v. Solimine*, 245 N.J. 326, 339 (2021) (quoting *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 191 N.J. 1, 13 (2007)).

latter any rights the former may have had against a third party who is liable for the damages." *Id*. The insurer "in effect steps into the shoes of the insured," and asserts any right to recovery the insured would have. *Standard Accident Ins. Co. v. Pellecchia*, 15 N.J. 162, 172 (1954).

Because subrogation allows an insurer to recover against liable third parties, an insurer cannot assert a subrogation claim against an insured. *See* 44A Am. Jur. 2d Insurance § 1726. An insurer may, however, "proceed against its own insured for destroying its right of subrogation by settlement with the tortfeasor." *Melick v. Stanley*, 174 N.J. Super. 271, 284 (Law. Div. 1980) (citing *Rogers v. Am. Fid. & Cas. Co., Inc.*, 52 N.J. Super. 254, 258–62 (App. Div. 1958)), *aff'd*, 181 N.J. Super. 128 (App. Div. 1981). A lawsuit against an insured for destroying an insurer's subrogation rights is an action for breach of contract. *Rogers*, 52 N.J. Super. at 262 (concluding that, when a person insured under a policy with a subrogation clause "settles his rights or liabilities . . . in such a manner as would as a matter of law bar a subsequent action by the insured against the other party for damages . . . , he breaches the subrogation condition in the contract.").

The Chemoil Settlement released Chemoil from all of Defendant's claims, meaning Plaintiffs could no longer step into Defendant's shoes and recover directly from Chemoil. Accordingly, the Chemoil Settlement destroyed Plaintiffs' subrogation rights, and Defendant breached the Subrogation Clause.

Defendant, however, argues the Court should grant him summary judgment because (1) Plaintiffs waived their right to subrogation, and (2) repeatedly breached the Policy. Neither argument compels summary judgment.

The Court starts with waiver. Subrogation, like any contractual right, "may be waived." *Skulskie v. Ceponis*, 404 N.J. Super. 510, 513 (App. Div. 2009). Waiver is "the voluntary and intentional relinquishment of a known right." *Knorr v. Smeal*, 178 N.J. 169, 177 (2003). "The

21

intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." *Id.* "The definition of waiver therefore focuses predominantly on the intent of the waiving party." *Marmo & Sons Gen. Contracting, LLC v. Biagi Farms, LLC*, 478 N.J. Super. 593, 607 (App. Div. 2024). Questions of intent "are factual determinations that should not be made on a motion for summary judgment." *Gillman v. Waters, McPherson, McNeill, P.C.*, 271 F.3d 131, 140 (3d Cir. 2001) (quoting *Shebar v. Sanyo Bus. Sys. Corps.*, 111 N.J. 276, 291 (1988)).

As evidence of waiver, Defendant points to a February 22, 2018 email from Plaintiffs, wherein counsel for Dual stated:

> I'd also note that at no point during any of our conversations have I used the word "subrogation." This is not a subrogation situation for [Dual]—if the case settles there would be a release and, therefore, no subrogation rights. And, if the [Panel] rules and awards fees, Chemoil would pay what is owed and there would be nothing to go after Chemoil for by way of subrogation as it would have fully satisfied its obligations. What I *have* said is that [Dual] has an interest in the settlement, and I have always been clear that we would be looking for reimbursement from any settlement.

(Def.'s Ex. GG.) Plaintiffs argue this email merely "clarif[ied] that they could pursue a reimbursement claim against Chemoil and had a vested right to do so." (Pls.' Opp'n at 18.)

The Court cannot resolve this dispute at this stage. Questions of intent are questions of fact. *Gillman*, 271 F.3d 131 (3d Cir. 2001). To find intent, the Court would need to draw inferences from the facts. *Anderson*, 477 U.S. at 255. That is for the jury. Because the Court finds there is a genuine issue of fact as to whether Plaintiffs intentionally waived their right to subrogation, the Court denies both parties' motions for summary judgment as to Count III.

Defendant also contends summary judgment is warranted because Plaintiffs repeatedly breached the Policy by: (1) wrongfully denying coverage; (2) not issuing a reservation of rights; (3) making a late payment; (4) making an underpayment; and (5) unreasonably delaying their

22

attempt to disclaim coverage. These purported breaches, however, do not compel the Court to enter summary judgment.

Defendant argues Plaintiffs wrongfully denied coverage under the Policy in March and May 2017 emails. In the March 2017 email, Dual stated that, as Chemoil's insurer, it had "no contractual or other legal relationship" with Defendant; that "[i]f or when [the action] is notified by [Chemoil], we will investigate it in the usual way, but only as between ourselves and [Chemoil]," and that "we do not accept your letter as notification of a Claim . . . on behalf of [Chemoil]. Further, we have not considered whether (potentially) the [P]olicy provides cover for the matters referred to in your letter." (Def.'s Ex. 5.) In May 2017, Dual reiterated that it had "not confirmed coverage and therefore any actions by [Defendant] or costs that he incurs . . . will be as a prudent uninsured. (Def.'s Ex. 7.)

A jury, making every reasonable inference for Plaintiffs, could infer from the correspondence that Plaintiffs did not deny coverage under the Policy, but reasonably requested more information and diligently investigated the claim. And, because a jury could infer Plaintiffs did not deny coverage, they could infer Plaintiffs did not need to issue a reservation of rights. A jury making every reasonable inference for Defendant could conclude that both emails constituted an effective denial of coverage, that denial was wrongful, and therefore, Plaintiffs needed to issue a reservation of rights. Because the Court cannot pick and choose which inferences can be drawn from the facts, *Nathanson*, 926 F.2d at 1380, summary judgment is inappropriate on this basis.

Likewise, the parties dispute (a) whether the $880,000 payment was late[12]; (b) whether the $880,00 was an underpayment[13]; and (c) whether Plaintiffs unreasonably delayed disclaiming coverage.[14] But, as before, whether Plaintiffs' conduct amounted to a breach, and whether that breach was material, are questions for a jury. *Magnet Res.*, 318 N.J. Super. at 286. Accordingly, the Court denies each party's summary judgment motion as to Count III.[15]

## C.   The Implied Covenant of Good Faith and Fair Dealing (Count IV)

Every contract in New Jersey has an implied covenant of good faith and fair dealing. *Comprehensive Neurosurgical, P.C. v. Valley Hosp.*, 257 N.J. 33 (2024). The covenant prohibits a party "from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224–25 (2005) (quoting *Palisades Props., Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). A party "breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001). "Proof of 'bad motive or intention' is vital to an action for breach of the covenant." *Brunswick Hills*, 182 N.J. at 225 (quoting *Wilson*,

---

[12] The Policy requires the insurer to advance claim costs (including defense costs) within ninety days of accepting such claim costs. (Policy § 4.2.) Defendant argues Plaintiffs did not advance the Interim Payment for 106 days after approving his claim on September 21, 2017. (Def.'s Moving Br. at 7; Coverage Determination.) Plaintiffs argue the Coverage Determination was not a final approval of Plaintiffs' claim. (Pls.' Opp'n Br. at 8.)

[13] Defendant claims the Interim Payment was "far lower than [Defendant] was entitled, and was determined without any supporting basis." (Def.'s Moving Br. at 8–9.) Plaintiffs argue the Interim Payment was not a "lowball figure." (Pls.' Opp'n at 8.)

[14] Defendant claims Plaintiffs knew about the Chemoil Settlement in March 2018, but waited until December 2018 to file a lawsuit and disclaim coverage. (Def.'s Moving Br. at 20.) Plaintiffs argue they filed the lawsuit after "investigating the possibility that they might be obligated to pay additional sums to [Defendant]." (Pls.' Opp'n Br. at 13.)

[15] Defendant further asserts that Plaintiffs did not suffer damages because they waived their right to subrogation. Because the Court cannot resolve the question of waiver as a matter of law, it cannot conclude that Plaintiffs did not suffer damages.

24

168 N.J. at 251). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." *Wilson*, 168 N.J. at 251.

Taken together, to state a claim for breach of the implied covenant, a plaintiff must show: "(1) a contract exists between the parties; (2) the plaintiff performed under the terms of the contract; (3) the defendant acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract; and (4) the defendant's actions caused the plaintiff to sustain damages." *Luongo v. Vill. Supermarket, Inc.*, 261 F. Supp. 3d 520, 531–32 (D.N.J. 2017).

Plaintiffs argue summary judgment is warranted on their implied covenant claim because: (1) Plaintiffs and Defendant were parties to the Policy; (2) Plaintiffs performed under the terms of the Policy when it advanced the Interim Payment to Defendant; (3) Defendant intentionally settled his fee claim for only enough to make himself whole (and not Plaintiffs); (4) Defendant unilaterally entered the Chemoil Settlement "with the intent to deprive Plaintiffs of any right to reimbursement"; (5) Defendant knew, when he entered the Chemoil Settlement, that Plaintiffs were still awaiting Defendant's response to their settlement proposal; (6) Defendant knew, when he entered the Chemoil Settlement, that he was "eviscerating Plaintiffs' then-existing subrogation rights"; (7) after entering the Chemoil Settlement, Defendant kept engaging Plaintiffs in "meaningless negotiations" to lead Plaintiffs to believe "that their compromise efforts were being considered"; and (8) Defendant made it impossible for Plaintiffs to recover the $880,000 Interim Payment. (Pls.' Moving Br. at 25–27.) Defendant, by contrast, argues he is entitled to summary judgment because he did not settle his fees claim in bad faith.[16]

---

[16] Defendant also argues that, as a matter of law, a party cannot maintain an implied covenant claim where the conduct at issue is governed by or arises out of the terms of an express contract. (Def.'s Moving Br. at 27.) To be sure, "the implied covenant of good faith and fair dealing cannot override an express term in a contract." *Wilson*, 168 N.J. at 244. Plaintiffs cannot bring an implied covenant claim alongside a breach of contract claim "when the two asserted breaches basically rest on the same conduct." *Wade v. Kessler Inst.*, 172 N.J. 327, 344 (2002). But here, the implied covenant claim involves "a distinct set of facts and considerations, even though it arises from the same general narrative as the breach of contract claim." *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d

25

Bad faith requires "subjective, wrongful intent." *Buck Consultants, Inc. v. Glenpointe Assocs.*, 217 F. App'x 142, 152 (3d Cir. 2007). Intent is a question of fact "that should not be made on a motion for summary judgment." *Gillman*, 271 F.3d at 140. And here, the parties dispute that question of fact. As Plaintiffs see it, Defendant gamed the system: he got Plaintiffs to pay his legal bills, negotiated a settlement behind Plaintiffs' back for Chemoil to pay those same legal bills, intentionally cut off Plaintiffs from recovering their Interim Payment, and lied to Plaintiffs about the settlement for weeks. In Defendant's telling, he negotiated a reasonable settlement in good faith and entered the settlement when Plaintiffs unreasonably refused to approve it.

Because the Court cannot pick and choose which inferences to draw from the facts, *Nathanson*, 926 F.2d at 1380, the Court denies both parties' summary judgment motions as to Count IV.

### D.    Quantum Meruit (Count V)

Quantum meruit applies when, "absent a manifest intention to be bound, 'one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 286 (App. Div. 2007) (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 437 (1992)). Quantum meruit is "wholly unlike an express or implied-in-fact contract in that it is 'imposed by the law for the purpose of bringing about justice without reference to the intention of the parties.'" *Id.* (quoting *Saint Barnabas Med. Ctr. v. County of Essex*, 111 N.J. 67, 79 (1988)). "In the case of actual contracts the agreement defines the duty, while in the case of *quasi* contract the duty defines the contract." *Saint Barnabas*,

---

56, 75 n.10 (D.N.J. 2018). Plaintiffs allege Defendant settled for just enough to cover his own expenses, knew that settling with Chemoil would cut off Plaintiffs' ability to recover, did so anyway, and then strung Plaintiffs along for weeks in negotiations that he knew were pointless. Those facts are separate from Plaintiffs' claim that Defendant settled his fee claim without consent. "Additionally, "federal practice and substantive New Jersey law allow for the pleading and pursuit of alternative and even inconsistent theories in pursuit of breach of contract and quasi-contractual theories. Plaintiffs merely are not permitted to recover on the inconsistent theories." *Id.* (citation omitted).

26

111 N.J. at 79–80 (quoting *Insulation Contracting & Supply v. Kravco, Inc.*, 209 N.J. Super. 367, 376 (App. Div. 1986)).

"It has long been recognized, however, 'that the existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit.'" *N.Y.-Conn. Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 449 N.J. Super. 542, 556 (App. Div. 2017) (quoting *Kas Oriental Rugs*, 394 N.J. Super. at 286). "An implied contract cannot exist when there is an existing express contract about the identical subject. The parties are bound by their agreement, and there is no ground for implying a promise." *Moser v. Milner Hotels*, 6 N.J. 278, 280 (1951) (quoting *Voorhees v. Ex'rs of Woodhull*, 33 N.J.L. 494, 496–97 (E. & A. 1869)).

Because the Policy is an express contract between Plaintiffs and Defendant, the Court has no grounds for applying quantum meruit. Accordingly, the Court grants Defendant's motion for summary judgment as to Count V.

### E.    Unjust Enrichment/Disgorgement (Count VI)

Disgorgement "is an equitable remedy, not a cause of action." *Johnson v. McClellan*, 468 N.J. Super. 562, 577 (App. Div. 2021). It is "grounded in the theory that a wrongdoer should not profit from its wrongdoing regardless of whether the innocent party suffered any damages." *County of Essex v. First Union Nat'l Bank*, 186 N.J. 46, 61 (2006). Consequently, the New Jersey Supreme Court "has construed disgorgement as an appropriate remedy in cases involving claims of unjust enrichment." *Johnson*, 468 N.J. Super. at 577 (citing *First Union*, 186 N.J. at 58). Because Plaintiffs cannot state a claim for unjust enrichment, disgorgement is not an appropriate remedy. And because disgorgement is not a standalone cause of action, the Court grants Defendant's motion for summary judgment as to Count VI.

**F.      Defendant's Counterclaims**

Finally, Defendant moves for summary judgment on his counterclaims for breach of contract, declaratory judgment that he is not obligated to reimburse the Interim Payment, declaratory judgment that Plaintiffs have no right to subrogation, and breach of the implied covenant. (Def.'s Moving Br. at 35–39.) The Court denies the motion on each counterclaim.

To state a counterclaim for breach of contract, a defendant must show (1) a contract; (2) defendant did what the contract required them to do; (3) plaintiff did not do what the contract required them to do; and (4) damages. *Goldfarb*, 245 N.J. at 338. Defendant did not do what the Policy's Consent Clause required him to do. He entered the Chemoil Settlement without Plaintiffs' consent. Defendant has not shown this breach was immaterial. Defendant, moreover, has not shown there is no genuine dispute of material fact as to damages, particularly where Plaintiffs *paid* Defendant $880,000 and Defendant settled his fee claim for a further $1.2 million.

Summary judgment is inappropriate to determine whether Plaintiffs are entitled to reimbursement or subrogation. As discussed above, there is a genuine dispute as to whether Plaintiffs waived their right to subrogation. And, if Plaintiffs did not waive their subrogation rights, they could sue Defendant in breach of contract for destroying their subrogation rights. *Rogers*, 52 N.J. Super. at 262. Consequently, the Court cannot conclude as a matter of law that Plaintiffs are not entitled to reimbursement of the Interim Payment.

Lastly, the Court cannot resolve Defendant's implied covenant counterclaim through summary judgment. Bad faith is a question of fact. *Glenpointe Assocs.*, 217 F. App'x at 152. Viewing the facts in the light most favorable to the nonmoving party, the Court cannot conclude that, as a matter of law, Plaintiffs acted in bad faith. That is a question for a jury.

28

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (ECF No. 76) is **GRANTED** as to Count I (Declaratory Judgment) and **DENIED** as to the remaining counts. Defendant's cross-motion for summary judgment (ECF No. 78) is **GRANTED** as to Counts V (quantum meruit) and VI (quantum meruit/disgorgement) and **DENIED** as to the remaining counts and counterclaims. An appropriate Order accompanies this Opinion.

DATED: 4/24/2026

_____
JULIEN XAVIER NEALS
United States District Judge

29